## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|                                      |     |                     |
|--------------------------------------|-----|---------------------|
| FELISHA STARKEY,                     | )   |                     |
|                                      | )   |                     |
| Plaintiff,                           | )   |                     |
|                                      | )   |                     |
| v.                                   | )   | No. 4:16 CV 93 DDN  |
|                                      | )   |                     |
| MISSOURI DEPARTMENT OF               | )   |                     |
| ELEMENTARY AND SECONDARY             | )   |                     |
| EDUCATION, DIVISION OF               | )   |                     |
| VOCATIONAL REHABILITATION,           | )   |                     |
| and                                  | )   |                     |
| COMMISSIONER OF THE                  | )   |                     |
| DEPARTMENT OF ELEMENTARY             | )   |                     |
| AND SECONDARY EDUCATION,             | )   |                     |
|                                      | )   |                     |
| Defendants.                          | )   |                     |

## MEMORANDUM OPINION

This action is before the court upon the cross motions of the plaintiff and the defendants for judgment as a matter of law, based upon the administrative record. (ECF Nos. 19, 21.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court heard oral argument on July 14, 2016, and the matter is ready for disposition.

On January 25, 2016, plaintiff Felisha Starkey commenced this action against defendants Missouri Department of Elementary and Secondary Education, Division of Vocational Rehabilitation ("VR"), and the Commissioner of the Department of Elementary and Secondary Education. Plaintiff brings the action under Title 1 of the Rehabilitation Act, 29 U.S.C. § 722(c)(5)(J)(i), which allows an aggrieved party to seek judicial review in a matter involving eligibility for vocational rehabilitation and the development of an individualized plan for employment.

Plaintiff claims under 29 U.S.C. § 722(b)(3)(F) that defendants:

(a) failed to timely develop her individualized plan for employment (Count 1);

(b) denied her right to an informed choice between employment outcomes under 29 U.S.C. § 722(b)(3)(B) (Count 2);

(c) violated her due process rights under 29 U.S.C. § 722(a)(5) (Count 3);

(d) through the hearing officer violated her due process rights under 5 C.S.R. § 20-500.190(8) (Count 4);

(e) through the Commissioner violated her due process rights under 5 C.S.R. § 20-500.190(10) and (12) (Count 5);

(f) violated her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, et seq. (Count 6); and

(g) discriminated against her under § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (Count 7).

The court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 722(c)(5)(J)(i). The court must consider the record and decide the case by a preponderance of the evidence. *See* 29 U.S.C. § 722(c)(5)(J)(ii).

## FINDINGS AND CONCLUSIONS

From the record before it, the court makes the following findings and conclusions:

A.     Medical History

On October 2, 2000, plaintiff was seen at Barnes-Jewish Hospital in St. Louis by Robert A. Swarm, M.D., in the Pain Management Clinic. She was prescribed several pain medications, including gabapentin, Percocet, OxyContin, Prozac, amitriptyline, and lorazepam for various mental health issues, as well as methylphenidate for excessive daytime sedation. (ECF No. 12 at 14.)

On February 22, 2001, plaintiff was seen by Robert A. Swarm, M.D., for pain medication management. Plaintiff reported that the medication regime at the time allowed her to "have a life" and she had recently accepted a job. She reported right ulnar neuropathy, pain in the right arm through the elbow. Dr. Swarm did not adjust her pain medications at this visit. (*Id.* at 16.)

On September 12, 2001, plaintiff was seen by Dr. Swarm for pain management. She reported significant life changes including an increase in daily exercise, cessation of smoking, and she discontinued her use of Prozac. Dr. Swarm increased plaintiff's gabapentin, and discontinued the amitriptyline. (*Id.* at 17.)

On April 15, 2002, plaintiff was seen by Dr. Swarm for pain management. Plaintiff reported significant right side sciatica caused by a disc bulge. Plaintiff was being assessed by two spine surgeons for possible surgery. Plaintiff's medications controlled her pain, but she has had occasional flare-ups. She had ulnar nerve transposition for her right ulnar neuropathy. There were no changes to her pain medications. (*Id.* at 18–19.)

On January 29, 2003, plaintiff was seen by Dr. Swarm for pain management. Plaintiff had visited an emergency room due to a migraine headache and was prescribed several medications. Dr. Swarm indicated that prophylactic therapy was not indicated for the migraine headaches as of yet, because plaintiff's migraines were highly infrequent. Dr. Swarm indicated a trial of Maxalt, a migraine pain medication, was initiated but did not change plaintiff's chronic pain medications. (*Id.* at 20.)

On March 4, 2005, plaintiff saw Dr. Swarm for pain medication management. Her medications were not changed. (*Id.* at 21–22.)

On May 15, 2006, plaintiff saw Dr. Swarm for pain management. She was complaining of increased back pain. Due to the severity of the pain, plaintiff had curtailed some of her normal activities and had to be absent from work. Dr. Swarm filled

out Family Medical Leave paperwork for her due to these needed absences. No major changes were made to her medication list. (*Id.* at 23–24.)

On October 5, 2006, plaintiff saw Dr. Swarm for pain management. She reported her back pain was more of a problem at this time than her facial neuralgia. She continued to express interest in decreasing her use of medication. She was to start another trial of pain medication, desipramine. Plaintiff was to consider physical therapy as well. (*Id.* at 25.)

On March 31 and April 21, 2009, plaintiff filled out health assessments for VR Services. She listed the medications she was taking for chronic pain, depression, anxiety, and high blood pressure. She stated that she would have problems sitting or being upright for eight hours, and there was an inability to type. (*Id.* at 45–48.)

On August 29, 2011, plaintiff filled out a health assessment questionnaire. She listed numerous medical issues including: pain, headaches, problems in her arms and legs, as well as depression. (*Id.* at 4–5.)

On February 7, 2014, plaintiff's doctor, Anthony Guarino, M.D., sent a letter stating plaintiff would be capable of attending school and working with certain accommodations: voice activated software, digital textbooks, and a headset that would not put pressure on her head. (*Id.* at 6–7.)


B.      Vocational Rehabilitation History

Plaintiff was first determined eligible for vocational assistance on February 15, 2007, and was determined to have post-lumbar laminectomy syndrome; ongoing back pain after surgery; secondary to atypical facial neuralgia; and intermittent, shooting pain in the face. The right side of her face was swollen and her left eye was partially swollen shut. As a result of her medications she can stay awake only three to four hours at a time

before she has to rest.  Also she has difficulty sitting or standing for long periods of time due to her back pain.  (*Id.* at 1; ECF No. 13 at 3.)

On October 8, 2007, plaintiff went to MERS-Goodwill for an exploratory evaluation to determine an appropriate vocational objective.  Several tests were performed, but due to pain in plaintiff's hands and shoulders not all tests could be performed.  (ECF No. 14 at 56–59.)

On April 21, 2009, plaintiff was evaluated again and determined to be eligible for services.  She was listed as primarily having degenerative disc disease and, secondarily, trigeminal/occipital neuralgia and nerve pain in her hands and arms.  (*Id.* at 2.)

On August 29, 2011, plaintiff filled out a health assessment questionnaire, which listed her current disabilities as facial pain, occipital neuralgia, nerve pain in both arms and hands, low back pain, nerve pain in both legs, migraines, anxiety, and depression. (ECF No. 12 at 53–54.)  She also filed an application for vocational rehabilitation services.  (ECF No. 13 at 1–5.)

The Missouri Division of Vocational Rehabilitation determined that as of September 6, 2011, plaintiff was significantly disabled and eligible for VR services.  Her listed impairments were atypical facial neuralgia and post-lumbar laminectomy syndrome.  She had limited endurance and mobility; limited ability to bend, twist, or lift; limited upper extremity function; sensitivity to light, noise, and pressure on her head; chronic pain; the need to frequently change positions; and the need to avoid bending her arms.  (*Id.* at 420–21.)

On December 9, 2011, plaintiff moved to Pacific, Missouri, requiring the transfer of her case from one VR office to another closer to her.  She indicated that she was starting to search for part-time employment based on her current abilities instead of predicting her future medical problems.  (*Id.* at 412.)

On July 16, 2013, plaintiff met with VR representatives regarding her case and her interest in acquiring employment as a speech language pathologist (SLP) or as a social worker. Plaintiff was of the opinion neither of those occupations would involve a significant amount of typing and would allow her to change posture positions as often as needed. Plaintiff did not seem interested in employment services that would try to obtain employment by using her existing skill set. (*Id.* at 367.)

On August 12, 2013, Claire Beck, VR office director, added a case note regarding the denial of any additional educational training, given plaintiff's current level of education (a Bachelor's degree in psychology and a Master's degree in management information systems), as well as significant disabilities. (*Id.* at 363, 367.)

On August 13, 2013, plaintiff sent an email to Ms. Beck expressing her frustration with the process. Plaintiff listed many of her problems with the employment options suggested so far by VR, including: customer service jobs, any significant telephone usage, and sales jobs with significant computer usage. Plaintiff did not believe she could reenter the employment market with any of her current skills and, therefore, she conducted research into speech pathology and social work. Both require significant additional education. (*Id.* at 359–62.)

On August 19, 2013, VR sent plaintiff a letter discussing the decision to assist her in obtaining employment with her limitations and the accommodations she requires, but with the skills she already possessed. She was denied the funding for any further college training. She was advised she had the right to appeal that decision. (*Id.* at 355, 357.)

On January 3, 2014, VR representatives discussed plaintiff's case and suggested Ms. Beck, the office supervisor, take over the case, because plaintiff was complaining about unresponsive personnel. Ms. Beck noted that plaintiff was only interested in contacting VR at the beginning of academic semesters. (*Id.* at 353.)

On February 3, 2014, plaintiff was advised by a VR representative that her case has been pending as eligible for over 600 days, and that, if she did not supply updated medical records, her case would be closed. (*Id.* at 349.)

On March 11, 2014, plaintiff met with Ms. Beck who summarized the meeting and indicated it may not be realistic to believe that plaintiff could work enough to get off social security disability because of the severity of her pain and symptoms. Plaintiff, who last worked 7 years earlier, described her current employment needs as work that does not cause her pain to flare up; allows her to interact with people, because that helps take her mind off her pain, counteracts her depression, anxiety, and worry, and increases her self-esteem; does not require her to type a lot, sit too long, hold her arms bent, stand, walk or twist a lot; is better scheduled for earlier in the day when her symptoms are better; involves no pressure on her head; avoids bright lights which hurt her eyes; allows her to move around, change positions, walk around, and control her activity; allows her to take breaks; and uses voice activation software, which she feels is needed as an accommodation. Plaintiff stated that she did not have a vocation goal in mind and was not set on speech pathology. (*Id.* at 346–47.)

On April 10, 2014, plaintiff emailed Ms. Beck regarding her meeting with two other representatives. She refused to agree to VR interviewing her family and friends or providing VR representatives with her medication list. She stated that she did not want the list of medications placed in her file for fear someone might try and steal the medications. Additionally, plaintiff claimed that the representatives insisted she do jobs that she could not perform due to disabilities in her arms. She believed that these representatives were not taking her disabilities into due consideration. (*Id.* at 292–93.)

On April 29, 2014, plaintiff signed a statement of understanding regarding the purpose of the Discovery and Exploration provided by the Missouri Division of Vocational Rehabilitation and MERS-Goodwill. Its purpose was to "determine a

vocational goal that is suitable for me considering my skills, interests, aptitudes, abilities, and limitations." (ECF No. 12 at 49.)

Also on April 29, 2014, plaintiff applied for assistive technology for educational and future employment use. (ECF No.14 at 99–100.)

On April 30, 2014, plaintiff met with both MERS-Goodwill representative Leslie Quarles and others about the Discovery and Evaluation process. It was noted that plaintiff was generally uncooperative with the representatives and she would only discuss those activities she could not do. VR determined that her pain was subjective and her limitations were so fused into her brain that she would automatically reject any suggestions that were not what she had already decided on—training for speech pathology. She was currently enrolled in two online classes for speech pathology through the University of Utah. Although she was currently using the computer to type and participate in these classes, she insisted that VR needed to provide her voice activated software for these classes. Plaintiff was described as being as difficult as possible; she would not look up phone numbers or make phone calls as part of the process without the voice software. Plaintiff stated that, if this does not work out the way she would like it to, she will "have a hearing and fight it out with you in court." Plaintiff stated she could not do repetitive hand motions; needs to be able to sit, stand, walk, and do different physical activities; is interested in using her voice to do the job; and likes interacting and helping people. (ECF No. 13 at 290–91.)

On April 29, 2014, plaintiff and Ms. Quarles met for a planning meeting. Plaintiff desired employment that would provide necessary minimum income instead of disability. Her limitations were listed again and she emphasized that she would need flexibility to do certain tasks at home or on other days due to her disabilities. (ECF No. 14 at 50–52.)

On May 2, 2014, Ms. Beck provided plaintiff with a possible job opportunity and requested a copy of plaintiff's resume. Plaintiff stated she was interested, but saw no use

in providing her resume as it had not been determined what type of employment she should be pursuing. (ECF No. 13 at 266–71, 276–80.)

On May 12, 2014, an update email was sent regarding plaintiff's case. Plaintiff was uncooperative in providing specific information regarding her medications, or in releasing her medical information to her advocate. Goodwill's representative attempted to explain how the medical information would be necessary if a specific vocational goal was developed after the discovery portion of plaintiff's case was completed. Plaintiff reiterated that was not necessary and she wanted to see such a demand in writing. (ECF No. 13 at 256.)

On May 27, 2014, plaintiff met with Goodwill staff member Donald Vaisvil who provided an overview of the voice-activated computer program. He explained that a user needed to spend several hours and sessions working with the program, which continues to adjust to the specific user. (ECF No. 14 at 1-3.)

On June 3, 2014, Bob Cunningham, Ph.D., assessed plaintiff for an assistive technology assessment. Dr. Cunningham's goal was to investigate the use of assistive technology to assist with plaintiff's participation in work and post-secondary education. However, plaintiff could not demonstrate this technology for Dr. Cunningham because she lacked an alternative earphone or headset. Dr. Cunningham discussed the use of different note-taking software and some of the accessibility features of her Apple® products. It was noted that plaintiff might benefit from an adjustable desk due to her inability to sit or stand for prolonged periods of time. (ECF No. 14 at 47–49.)

On June 4, 2014, plaintiff and Goodwill representatives exchanged emails regarding plaintiff's ability to answer some of the skill questionnaires. Plaintiff complained she could not continue having long meetings with VR personnel and Goodwill representatives. Goodwill noted that plaintiff had been complaining of constantly driving to appointments. (ECF No. 13 at 181–86.)

On June 9, 2014, plaintiff and Goodwill representatives exchanged emails regarding her need for assistive devices. Plaintiff insisted her treatment and school had nothing to do with her employment evaluation and the reason her plans had not moved forward was the result of Goodwill and her advocate expecting her to do things her disabilities prevented her from doing, such as answering emails frequently, researching and following up on matters independently, or driving to appointments. Plaintiff insisted that, if she was denied these items, it was because the Goodwill representative has "a lack of understanding [regarding] invisible disabilities." She then requested the representative's supervisor's contact information. (*Id.* at 164–80.)

On June 13, 2014, plaintiff and Goodwill exchanged emails regarding meetings and her expectations, including an attempt to update her résumé. Plaintiff resisted updating her résumé and was unable to continue emailing Goodwill, because it was taxing on her disabilities. Also, she was unable to use her cell phone frequently. (*Id.* at 115–21.)

On June 17, 2014, a local speech therapist informed Goodwill that a speech therapist normally had to devote 10 to 20 minutes per client to document the therapy session or other client interactions. And good computer skills were also necessary. (*Id.* at 132–39.)

On June 20, 2014, plaintiff met with Goodwill representatives to conduct career exploration. She reviewed careers such as social human services assistant, intake specialist, library assistant, activities aide, home care companion, substance abuse counselor, and speech pathology. Several of these careers require significant amount of time traveling, entering data and notes into a computer, completing a significant amount of paperwork, and meeting firm deadlines. (*Id.* at 4–8; 90–91.)

On June 23, 2014, Goodwill contacted a local speech pathologist to learn the requirements of that career field. Speech pathology required lifting at least 15 pounds,

grasping and clasping, reaching and pulling, and sitting at a desk for two hours or longer. (*Id.* at 86–97; ECF No. 14 at 9.) Plaintiff and Goodwill exchanged emails regarding her lack of practice with the voice-assisted software and her lack of progress on the discovery and exploration part of her employment assessment. Plaintiff also listed the issues she was having with her employment plan, due to both medical and personal reasons. She can sit only 30 minutes at a time and driving an hour and half to the Goodwill office is too long for her to sit. She cannot participate in online school activities because typing causes too much pain, but she can complete some online courses. (ECF No. 13 at 74–77.)

On July 2, 2014, Ms. Quarles met with plaintiff to review her vocational exploration. Her limitations were restated as was the fact that she was not able to participate fully in the exploration process. (ECF No. 14 at 95–98.)

On July 3, 2014, Goodwill personnel noted that there were still issues regarding the exploration report. Goodwill determined that plaintiff could not work full or part time in either of her two main fields of interest due to her personal scheduling commitments and physical restrictions. Furthermore, plaintiff would not need an additional degree in Counseling or Speech Pathology in order to work part time. She already has skills that are applicable to the work of home companions and disability advocates. The agency determined it would meet with plaintiff to state its recommendation for job development at all; it would then offer her a hearing. (ECF No. 13 at 65–69, 98–102, 109–10.)

On July 8, 2014, Goodwill provided an assessment update. Two therapists were interviewed and indicated that sometimes speech therapists were required to pick up children or crawl under tables to focus their youth patients. Plaintiff disputed that finding. (*Id.* at 64; ECF No. 14 at 10.)

On July 16, 2014, emails between Goodwill and plaintiff detailed the problems plaintiff was having contacting speech therapy locations for shadowing and Goodwill's offer to contact places for her. (ECF No. 13 at 62–63.)

On July 24 and 28, 2014, several emails were exchanged between potential speech therapy observation locations, VR, and plaintiff. The final emails on July 28 indicated VR was unsure that plaintiff had ever followed-up with any of the leads for possible observations. (*Id.* at 19–26.)

On July 29, 2014, Ms. Beck filed a case note regarding plaintiff's shadowing of speech therapists. There were no speech therapists that would allow both plaintiff and VR personnel to observe a session; therefore, plaintiff must schedule the observation on her own. One organization had been contacted, but it refused to allow plaintiff to shadow due to her "volatile and uncooperative" nature. Plaintiff refused to release information regarding her medical conditions to the organization, which posed a liability. (*Id.* at 16, 35–38, 43–59.) Separately, Goodwill contacted additional speech pathologists to inquire about their workload and requirements. One speech pathologist traveled 25–50% of the time. (*Id.* at 10.)

On August 15, 2014, Goodwill contacted a local counselor for an informational interview. This counselor said she traveled 30–40% of her day, needed to bend, stoop, twist, turn, remain in one position for an extended amount of time, lift 15 pounds or more, and be exposed to heat for prolonged periods of time. (*Id.* at 10.)

On August 22, 2014, Ms. Quarles assessed plaintiff's case. Ms. Quarles indicated plaintiff is unable to lift more than 15 pounds, climb, grasp, reach, pull, push, twist, turn, stoop, endure prolonged heat or cold exposure, and endure prolonged sitting, walking, or standing. She must have access to a chair or bed to recline with ice packs during lunch or other breaks. She cannot type due to pain. She did not participate with Goodwill fully in the exploration process. Appointments lasting more than two hours were a problem for

her, but she insisted on not traveling to and from shorter appointments every day.  She refused to go to the local Goodwill Center to work on the voice activated software if it was only for one hour, saying it was not a good use of her time and the software should be given directly to her to practice at home.  She refused to provide a list of her medications.  She was slow to respond to communication, she had only limited availability, and was generally limited in her participation in the exploration process.  She was unwilling to work on her resume as it was "premature."  On June 2, 2014, plaintiff was provided with a list of speech pathology locations to job shadow, but plaintiff never followed up with them.  Opportunities for job shadowing were offered on April 29th, July 8th, 9th, 15th, 23rd, and 28th, but to Ms. Quarles's knowledge, plaintiff never followed up.  Ms. Quarles did not recommended job development due to her concerns regarding plaintiff's stamina and other limitations.  The accommodations she has requested would be considered by employers as unreasonable based on the primary responsibilities and expectations of the positions.  (ECF No. 14 at 12–14.)

On September 9, 2014, VR met with plaintiff to review her request for vocational rehabilitation services and the progress of her case so far.  According to VR employees, plaintiff was either unwilling or unable to cooperate with VR from April through August 2014.  She attended dictation training and had a few meetings with a VR employee.  Plaintiff did not follow up with potential employers on job leads or contact speech therapists or counselors for informational interviews.  Plaintiff did not respond to or return phone calls and was reluctant to practice using the voice-activated software.  In fact, plaintiff had not installed the software on her computer, citing the lack of a microphone or a Bluetooth device.  Plaintiff cited her pain, medications' side-effects, limited stamina, inconvenience, and costs as reasons for her failure to participate.  Plaintiff did not explore any alternative vocational goals, but remained fixed on a goal to

return to school and study speech therapy, regardless of her inability to meet the physical demands or stamina requirements.  (ECF No. 13 at 6–7.)

Goodwill provided an Exploration Planning Report which described its interaction problems with plaintiff.  It noted that plaintiff refused to share her medical information, which limited their ability to assess the support she needed.  Plaintiff countered that this information would not be privacy protected.  Goodwill also indicated that plaintiff was slow to respond to communications, had limited availability, and was generally limited in her participation.  Plaintiff countered that VR rescheduled appointments as well. Goodwill indicated that plaintiff was unwilling to work on her résumé; would not practice on the audio software because of the inconvenience of driving to Goodwill's office; and failed to follow up with provided speech pathology observation opportunities. Although the locations were provided, plaintiff failed to follow up on any of them.  The importance of job observation was discussed on April 29, May 5, July 8, July 9, July 15, July 23, and again on July 28, 2014.  Plaintiff never responded.  Goodwill determined that plaintiff should not pursue the fields of speech pathology or counseling; it also determined that plaintiff ought not to work full time in another field, due to her lack of stamina and other limitations.  Plaintiff's requested accommodations would be unreasonable based on these employment positions' responsibilities and expectations. Goodwill suggested plaintiff look to ways to work part-time or freelance from home. (ECF No. 13 at 28; ECF No. 14 at 45.)

VR sent a letter to plaintiff on October 7, 2014, informing her that "[d]ue to the severity of your disabling condition, it appears that you are unable to benefit from our services at this time."  (ECF No. 12 at 8.)

C.     Hearing

On May 29, 2015, a hearing was held at the South Vocational Rehabilitation office in St. Louis, Missouri.  Plaintiff was present with counsel.  (ECF No. 9.)  Plaintiff admitted several exhibits.  (ECF No. 10.)  First, the deposition of Kevin King, M.D., a family physician, stated that he diagnosed plaintiff with trigeminal neuralgia, occipital neuralgia, chronic headaches, low back pain from lumbar surgery in 2003 and 2009, lumbar radiculopathy, myofascial pain syndrome, peripheral neuropathy, and attention deficit disorder.  She requires accommodations and modifications including additional testing time due to her Attention Deficit Disorder and dictation software with an earpiece.  Dr. King asserted plaintiff could work but she needs employment that would allow for changes in position, the occasional use of ice on her muscles, movement, little computer work, and flexible hours.  (ECF No. 10.)

Plaintiff's pain management physician, Anthony Guarino, M.D., stated that she is capable of attending school and working as long as there are modifications in place to prevent exacerbation of her chronic pain conditions—trigeminal neuralgia, peripheral neuropathy, and low back pain.  She needs voice activated software, a headset which will not place pressure on her head, and digital textbooks.  (ECF No. 10-11.)

Evidence was presented that plaintiff observed a speech-language pathologist, Jan Butler, on September 23, 2014.  She arrived early, stayed for three hours of observation, and stayed late to ask questions about the profession and her observations.  (ECF No. 10-1.)  Plaintiff would be continuing volunteer opportunities with Ms. Butler beginning on June 26, 2015.  (ECF No. 9 at 7:1–3.)  Plaintiff shadowed another speech therapist, Pamela Haas, on October 1, 2014 for three hours.  Plaintiff began volunteering at the Immigrant & Refugee Women's Program in St. Louis on May 19, 2015, providing English instruction to a Taiwanese woman.  (ECF No. 10-8.)  Other exhibits evidenced

the various emails and contacts plaintiff had with various speech pathologists and organizations she was attempting to shadow.  (ECF Nos. 10-2, 3, 4, 5, 6, 7, 9, 10.)

Plaintiff testified on direct examination to the following.  She has an MBA and a degree in psychology.  She worked as a lab tech, a data management specialist, and an internal IT auditor between 1995 and 2007.  (ECF No. 9 at 10:7–17.)  She is now diagnosed with degenerative disc disease, congenital neuralgia, and peripheral neuropathy.  (*Id.* at 10:22–24.)  She can no longer spend the majority of her time at a desk or sit in a chair typing.  She has a current employment goal of becoming a speech language pathologist, which will require her to complete a Master's degree in speech pathology and obtain a license from the state.  Currently she requires dictation software, a Bluetooth earpiece, additional testing time, and electronic textbooks to complete classes.  (*Id.* at 11:3–22.)  Plaintiff believes that she could work as a speech language pathologist if she was given an extra break, during which she would need to take medicine, recline, and ice her back.  After that break she could continue working for the day.  (*Id.* at 12.)  Plaintiff has shadowed various therapists and is currently working with a woman's program teaching women to speak English.  She needs the flexibility to move around that speech pathologists have, depending on the clientele.  (*Id.* at 13.)

On cross-examination, plaintiff testified that speech pathology was the only career that she found that fit her needs.  She may need a break in addition to her lunch hour and may have to move to part time work or flex time.  Currently, plaintiff needs to lie down once a day for 45 minutes to an hour.  (*Id.* at 15–17.)  She works at the immigrant clinic for two hours a week and she will be assisting a speech pathologist for approximately six hours a day.  Plaintiff shadowed the speech pathologists after her case with VR was closed, because the school was on summer break when she first contacted them.  (*Id.* at 19–21.)

Ms. Beck testified that, although she normally supervises employees who work with clients, she occasionally helps clients, if the case is particularly difficult or complicated. (*Id.* at 22:1–14.) After initially denying plaintiff's request for additional college training, because she could possibly use the skills she already has for employment, plaintiff and VR agreed to engage a discovery and exploration process. In discovery and exploration, work samples, interviews, and résumé development are done to see what careers are possible. (*Id.* at 23.) Plaintiff was originally referred to Goodwill in Washington, Missouri, but after a three hour meeting with them she refused to work with them again. Ms. Beck stated that plaintiff refused to provide them certain information or accept suggestions about other possible avenues of employment. She was then reassigned to Goodwill in St. Louis. (*Id.* at 24:6–24, 25:2–18.) Ms. Quarles was assigned to work with her. Ms. Quarles concluded that due to her multiple limitations and limited stamina, plaintiff was unable to work in any capacity.

Ms. Beck testified about the possible reasons for case closure that are listed in the VR client services guide. (ECF No. 10 at 10). Under the guide, VR must select only one reason for closure, and in plaintiff's case this was because they found "disability too significant/unable to benefit from VR services." (ECF No. 9 at 27:18–22.) This decision was based on input from plaintiff and her limitations that were shown during the exploration process. These limitations included: debilitating pain, medication causing drowsiness, limited driving time, being unable to sit for prolonged periods, her inability or unwillingness to participate in suggested activities, her need to lie down or recline at work, and her need to take breaks more often than normal. (*Id.* at 28.) If VR could choose two options for closure, Ms. Beck would have also chosen failure to cooperate. Plaintiff missed appointments, refused to do suggested activities, was not forthcoming about medications, would not help develop a resume, and was upset when possible

employment leads were suggested.  Plaintiff alleged that Ms. Beck did not understand her limitations and was suggesting activities plaintiff was unable to do.  (*Id.* at 29.)

Ms. Beck then discussed the federal guidelines for rehabilitative services (ECF No. 11, Ex. 1 at 40), and the types of case closures listed there.  Based on the federal guidelines, Ms. Beck would still choose "disability too significant to benefit from services" as her primary reason for closing plaintiff's case.  (ECF No. 9 at 30:11–15.) However, a second reason would have been "no longer interested in receiving services or further services."  This code is for individuals who choose not to participate or continue in the VR services program, including failure to make appointments, counseling, or other services.  (*Id.* at 30:16–23.)  Ms. Beck testified that plaintiff either missed or rescheduled at least half of her appointments.

Ms. Beck testified to the medical evidence in the VR records, beginning on August 29, 2011.  Plaintiff filled out a questionnaire that listed all of her disabilities and the limitations she had due to pain and medications.  Also, VR had a letter from plaintiff's doctor, Dr. Guarino.  (*Id.* at 38:4–22.)  Ms. Beck stated that the restrictions listed by plaintiff and her doctor would impact her ability to be employed as a speech pathologist.  Some problems included her inability to sustain typing, holding her arms in a bent position, her inability to wear headgear, her sensitivity to light and noise, chronic pain that limits her endurance, and her need to frequently change positions.  (*Id.* at 39:6–24.)

Ms. Beck testified that her last meeting with plaintiff included a summary of why employment services were not recommended.  These reasons included her lack of cooperation, her lack of follow-through, reluctance to fully participate, and the fact that plaintiff found it painful and inconvenient for her to participate.  (*Id.* at 42:15–23.) According to Ms. Beck, plaintiff made excuses for her lack of participation, including not being able to type, not wanting to drive into St. Louis, being able to sit for only thirty

minutes, and being unable to drive more than an hour and half. (*Id.* at 44.) Plaintiff could not sit for more than one or two hours at a time, two days in a row, because any desk work had to be in small amounts and then she would need to get up and move around. Ms. Beck testified that these types of limitations would make employment as a speech pathologist or in almost any kind of job difficult. (*Id.* at 47: 2–12.)

Ms. Beck testified that, because VR and Goodwill were already having issues with plaintiff, she had plaintiff sign an agreement regarding the discovery and exploration process. These issues included plaintiff refusing to answer questions about medical conditions, treatment, limitations, and past work experiences. Also the discovery and exploration process involved work samples and informational interviews in the St. Louis area, requiring plaintiff to travel, something plaintiff was reluctant to do. (*Id.* at 49:9–25.)

Upon cross-examination, Ms. Beck admitted that she was not a physician and made her disability determination based on the actions of the plaintiff. Although she considered Dr. Guarino's letter, it was not the deciding factor. (*Id.* at 52–53.) Ms. Beck testified that although the listed reason for closure was her disabling condition, the case notes indicate that plaintiff's lack of cooperation was a problem. (*Id.* at 54–55.) Ms. Beck admitted that often voice activated software and earpiece usage would not be unreasonable accommodations. (*Id.* at 56.) According to Ms. Beck, plaintiff's stamina limitations and her inability to use the computer for extended periods of time would be problematic. (*Id.* at 59–60, 65–66.)

Ms. Beck testified that plaintiff also failed to follow up on referrals for employment, including with speech pathologists. (*Id.* at 72.) Plaintiff complained to Ms. Beck that she could not continue to answer emails because it was fatiguing, but then complained of the same problem when the telephone was used instead. Ms. Beck also reported plaintiff missed six or seven appointments, about half of her appointments. (*Id.*

at 73–75.)  On September 9, 2014, all parties met and discussed different options and informed plaintiff of her right to ask for a fair hearing.  VR indicated that it could not recommend employment services for a full-time speech pathology position.  Ms. Beck and Ms. Quarles indicated that they could possibly support part-time work in counseling or other goals, but plaintiff would not budge from full-time employment in speech pathology.  (*Id.* at 97–98.)

Ms. Quarles testified that plaintiff's interests were speech pathology and counseling, and possibly writing a blog or doing voice-over work.  Quarles stated that plaintiff only spent two sessions with the Goodwill IT worker learning how to use the voice-over technology.  This was an insufficient amount of time to learn the program and for the program to adapt to plaintiff as well.  Plaintiff also insisted she could not meet with her two days in a row or meet with Goodwill employees an entire day; these limitations concerned Ms. Quarles about plaintiff's ability to work full time.  (*Id.* at 85:4–12.)

Ms. Quarles provided plaintiff with several speech pathology leads, but would have to follow-up on them herself, because plaintiff never did.  When Ms. Quarles provided other employment options to plaintiff, she would make reasons why those jobs were not appropriate for her.  (*Id.* at 85–86, 89–90.)  Ms. Quarles testified that, if plaintiff followed-up on any given leads, it was months after they were provided to her.  (*Id.* at 94:7–10.)

On cross-examination, Ms. Quarles described how plaintiff complained of the distance of the drive to the Goodwill office, forty minutes each way.  Plaintiff was also unable to complete longer, less frequent appointments.  The voice activated software was available at the Goodwill office closer to her, but that was inconvenient for plaintiff as well.  Goodwill does not loan out equipment for use at a client's home.  (*Id.* at 93:5–25.)

D.    Hearing Officer's Decision

1)    Facts Found

On June 17, 2015, the hearing officer issued a written decision that found the following facts.

Plaintiff completed an application for VR Services on August 28, 2011, stating her disabilities as atypical facial neuralgia and post-lumbar laminectomy syndrome. Her limitations included limited lifting, bending, sensitivity to light and noise, a need to avoid pressure on her head and face, limited endurance, a need to frequently change position, and avoiding bending her arms at a 90-degree angle. (ECF No. 9-1 at 3.)

Plaintiff missed appointments on September 16, November 2, and November 8, 2011. Plaintiff then moved and her case was transferred to a new office on December 9, 2011. VR contacted plaintiff on December 12, 2011, and she indicated she was still interested in services on January 10, 2012. Plaintiff missed another appointment and it was rescheduled to March 1, 2012. This appointment was missed as well. (*Id.* at 3–4.)

Plaintiff kept her appointment on March 7, 2012, and possible employment services were discussed. On June 8, 2012, plaintiff discussed possibly working towards a Master's degree in social work or speech pathology, and working specifically with the elderly. An appointment on December 4, 2012, was not kept; neither was one on December 11 or 18, 2012. On January 6, 2013, plaintiff contacted her counselor to inquire about school and how to start the process for educational services. (*Id.* at 14.) On May 1, 2013, plaintiff indicated that she had researched summer classes, possibly online with Utah State University. Plaintiff's counselor indicated that such would have to be discussed and that his supervisor must be involved. On July 16, 2013, plaintiff and her counselor discussed how the reimbursement process might be handled and how these classes would be required for the graduate program. They also discussed how her current college degrees, a Bachelor's degree in Psychology and a Master's degree in Information

Management Systems, might be used for employment. Plaintiff stated she could not now type like she could in her previous jobs. Plaintiff also indicated she must alternate between sitting and standing. She felt employment was impossible with her existing skill set. A letter was sent on August 19, 2013, summarizing the discussions, stating VR staff would assist her in obtaining employment using her transferable work skills and her needed accommodations. (*Id.* at 4–5.)

On January 27, 2014, a ten-day closure letter was issued. Plaintiff responded she was still interested in services and would be working with Byron Koster, a Senior Advocate. During a meeting on March 11, 2014, accommodations were outlined and a discovery and exploration procedure was suggested to determine whether plaintiff would benefit from any services at all. (*Id.* at 5.)

On April 1, 2014, Goodwill began the discovery and exploration process with plaintiff. On April 7, 2014 the Missouri assistive technology program was suggested to allow plaintiff to learn how to use the voice activated software program. On May 12, 2014, plaintiff stopped her limited participation in the discovery and exploration process, because she needed to find a new doctor. Plaintiff was taking two classes, but would not discuss them with Goodwill. (*Id.* at 5.)

Plaintiff was advised that an occupational therapy assessment was needed, which would require a physician's request. Plaintiff questioned the need for this assessment, but nonetheless, her doctor sent a request on May 15, 2014. During June 2014, plaintiff was offered several opportunities for job shadowing, which plaintiff was slow to follow-up on. VR, Goodwill, and Missouri Assistive Technology staff provided training on the voice-activated software and information regarding possible employment opportunities. (*Id.* at 5–6.)

On September 9, 2014, plaintiff and members of VR staff and Goodwill met and it was decided that VR would not recommend employment services at this time due to the severity of her disabilities. (*Id.* at 6.)

### 2) Hearing Officer's Decision

The hearing officer found that plaintiff clearly met the medical requirements for VR services. Plaintiff was given many opportunities to use VR services, but failed to take advantage of these opportunities. These services included training for voice activated software, providing contacts for potential employment, and shadowing speech pathologists. Plaintiff stated that she could not participate due to pain, medication side effects, limited stamina, cost, and inconvenience. The hearing officer's decision was stated thus: "Decision: The decision of the Missouri Division of Vocational Rehabilitation to place Ms. Starkey's record in an inactive file status on 9/17/[2]014 because of the inability to benefit from VR services is upheld." (*Id.* at 5-9.)

### E. Commissioner's Decision

Plaintiff appealed the decision of the hearing officer on July 2, 2015. Plaintiff argued to the Commissioner that the hearing officer's decision was erroneous because (1) it was based on facts outside the reason given for her case closure; (2) it was based on the unstated determination that plaintiff was not responsive and cooperative with VR; (3) the stated reason, that plaintiff was too disabled to benefit from VR services, was not supported by the record; and (4) there was an improper ex-parte meeting between the impartial hearing officer, VR representatives, Goodwill representatives, and defendants' attorney. (ECF No. 14-14 at 1–2.)

Defendants responded that the hearing officer properly found that plaintiff's uncooperative nature and her disabling condition resulted in VR's decision that plaintiff

could not "benefit from an employment outcome." Defendants argued that, had plaintiff been open to career goals other than speech pathology, VR may have been able to provide services. VR determined that plaintiff's disabilities would prevent her from finding employment as a speech pathologist and, therefore, she could not benefit from VR services. Defendants argued the hearing officer properly relied on plaintiff's uncooperativeness because of the cost and inconvenience of traveling to training and employment opportunities, and plaintiff's disabling conditions, including "pain, narcotic side effects, [and] limited stamina." Finally, defendants argued that plaintiff did not preserve the alleged ex-parte communication for appeal. The last argument was explained as a misunderstanding, because plaintiff and her lawyer requested time to confer before the hearing and, therefore, they were not brought into the hearing room until twenty minutes after the scheduled start time. (ECF No. 14-13 at 1–2.)

In a one-page document the Commissioner of Elementary and Secondary Education made the following decision:

> Guidance used to assist review of administrative proceedings requires clear and convincing evidence to overturn or modify.
>
> Black's Law Dictionary defines clear and convincing evidence as "Evidence which is positive, precise and explicit, as opposed to ambiguous, equivocal, or contradictory proof, and which tends to directly to establish eh point to which it is adduced, instead leaving it a matter of conjecture or presumption, and is sufficient to make out a prima facie case."
>
> In reviewing the documents presented at the due process hearing, the due process hearing transcript, letters from both attorneys and review of the relevant regulations, I find that the impartial hearing officer's decision was based upon competent and relevant evidence. Therefore, your appeal must be denied.

(ECF No. 9, Ex. 2.)

<u>**DISCUSSION**</u>

Plaintiff and defendants move for judgment based on the administrative record now before the court. (ECF Nos. 19, 21.) As stated, the court must consider the record and decide the case by a preponderance of the evidence. *See* 29 U.S.C. § 722(c)(5)(J)(ii).

For the reasons discussed below, the court grants each of the parties' motions for relief only in part.

### A.      Title I of the Rehabilitation Act (Counts 1 and 2)

Plaintiff alleges two violations of Title I of the Rehabilitation Act, 29 U.S.C. § 720, *et seq.*   First, that VR failed to timely develop her individualized plan for employment as required by 29 U.S.C. § 722(b)(3)(F). Second, VR denied plaintiff her right to choose between employment outcomes as guaranteed by § 722(b)(3)(B).

The state agency's decisions under the Rehabilitation Act are to be reviewed by this district court under "a preponderance of the evidence [standard], while giving due weight to the conclusions reached in the State's due process hearing." *Reaves v. Mo. Dep't of Elementary and Secondary Educ.,* 422 F.3d 675, 681 (8th Cir. 2005); *see also, Wasser v. N.Y. Office of Vocational and Educ. Servs. For Individuals with Disabilities*, 602 F.3d 476, 480 (2d Cir. 2010). This standard is "more deferential than *de novo* review, and requires the district court to refrain from its own notions of sound policy for those of the state authorities." *Reaves*, 422 F.3d at 681. This deferential standard is particularly applicable where, as here, "the district court received no new evidence and made no independent factual findings . . . ." *Id.*

The Rehabilitation Act requires the state agency to develop and implement an "individualized plan for employment" (IPE),

> in a manner that affords eligible individuals the opportunity to exercise informed choice in selecting an employment outcome, the specific vocational rehabilitation services to be provided under the plan, the entity

that will provide the vocational rehabilitation services, and the methods used to procure the services, consistent with subsection (d) of this section.

29 U.S.C. § 722(b)(3)(B). The IPE should be developed

as soon as possible, but not later than a deadline of 90 days after the determination of eligibility described in paragraph (1), unless the designated State unit and the eligible individual agree to an extension of that deadline to a specific date by which the individualized plan for employment shall be completed.

§ 722(b)(3)(F). The IPE should take into account the "unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the eligible individual, consistent with the general goal of competitive integrated employment." § 722(b)(4)(A). Furthermore, the IPE must be agreed to and signed by both the eligible individual and a qualified vocational rehabilitation counselor employed by the state. § 722(b)(3)(C). An eligible individual does not have an unlimited ability to select an employment goal and, therefore, have an IPE developed only for that goal. *See Reaves*, 422 F.3d at 680; *LaFleur v. South Dakota*, Civ. No. 05-4153 KES, 2007 WL 1447734, at *10 (D.S.D. May 10, 2007).

In the present case, the state VR agency determined that plaintiff was eligible for services on September 6, 2011. Specifically, the VR case note indicated "[t]he participant and counselor have determined that this individual requires and can benefit from VR services to prepare for, enter for, enter into, engage in, or retain gainful employment." (ECF No. 13 at 420–21.) This determination should have resulted in an IPE developed by December 6, 2011, but plaintiff's actions made that impossible. She missed appointments on September 16, November 2, November 8, December 9, and December 12, 2011, and January 10, February 23, and March 1, 2012. (ECF No. 9 at 3–4; ECF No. 13 at 405–18.) On November 2, 2011, plaintiff called Ms. Beck and informed her that she had "a lot going on for next few months, but wants case left open." (ECF No. 13 at 416.) Throughout 2012 and until July of 2013 plaintiff did not

reasonably engage with VR in developing a plan for services, by contacting VR infrequently. (*Id.* at 357–404.)

In July 2013, plaintiff and VR were in contact several times, discussing a possible vocational goal, without which an IPE could not be developed. On August 19, 2013, VR denied plaintiff's request for further college education, because it believed she could become employed with the skills plaintiff already possessed. (*Id.* at 355–57, 360–61.) Plaintiff insisted that she could not return to her previous job and was only interested in education which would further her desire to become a speech pathologist or a social worker. (*Id.* at 361.)

There was no contact between VR and plaintiff until December 2013. (*Id.* at 354–55.) On January 27, 2014, VR sent plaintiff a closure letter. (*Id.* at 351.) Plaintiff met with VR representatives on March 11 and 24, 2014, when a Discovery and Exploration (D&E) process was discussed; no IPE was discussed. (*Id.* at 337, 346–47.) The D&E was to begin on March 31, 2014 (*id.* at 337); it was not actually commenced until April 30, 2014. (*Id.* at 290–91.) The D&E agreement was signed on April 30, 2014, by plaintiff and stated,

> I understand that the purpose of Discovery and Exploration service provided by MO DVR and MERS-Goodwill, is to determine a vocational goal that is suitable for me considering my skills, interests, aptitudes, abilities and limitations
>
> I understand that the discovery process will involve questions to learn about my medical conditions, treatments, limitation, skills, aptitudes, abilities and interests as well as my past work experiences.
>
> I understand the exploration process will involve work samples, job shadowing, informational interviewing as well as other forms of research to learn about specific vocational goals and how they might match with my limitations, skills, aptitudes, abilities and interests.

(*Id.* at 288–89.)

As found by the hearing officer, after this agreement for D&E was signed, plaintiff was only minimally involved with the D&E process provided by Goodwill and VR personnel. (ECF No. 9-1 at 5–6.) She failed to timely follow-up with informational job interviews, leaving Goodwill personnel to do several of them on their own. (*Id.* at 35–37, 78–95, 133–34, 153–63.) She only minimally participated in training on the voice activated software, due to her own limitations. (*Id.* at 147–51, 164–65, 187, 227–47, 265, 285.) After all of this, a meeting was held on September 9, 2014, and it was determined that VR services could not be offered because of the severity of her disability, including concerns regarding her stamina, requested accommodations, and other concerns. (*Id.* at 28–29.)

The State agency's decision not to offer employment services to plaintiff is supported by a preponderance of the evidence. Plaintiff was uncooperative in determining possible employment options; she presented only two careers of interest to her, speech pathology or counseling. VR personnel, after interacting with plaintiff for two years and conducting significant investigation into these careers, determined that plaintiff could not perform either of them. Therefore, they could not recommend either as an employment goal for an IPE, considering, as required, plaintiff's "unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the eligible individual, consistent with the general goal of competitive integrated employment." 29 U.S.C. § 722(b)(4)(A). This court finds that the state agency's decision regarding the impracticability of plaintiff's personally chosen employment goal is supported by a preponderance of the evidence. Without a suitable and mutually agreeable employment goal, an IPE could not be developed, and, therefore, defendants' decision to not support her impracticable employment goal or develop an IPE based on that goal was supported by a preponderance of the evidence. Therefore, judgment will be entered for defendants on Counts 1 and 2.

**B.      Due Process Claims (Counts 3, 4 and 5)**

Plaintiff alleges three due process claims:  (1) that VR violated her due process rights under 29 U.S.C. § 722(a)(5) by not providing her with a written notice of the clear and convincing evidence that established that she was too disabled to benefit from services, Count 3 (ECF No. 1 at 10–11); (2) that in violation of 5 C.S.R § 20-500.190(8) the hearing officer failed to include findings of fact and conclusions of law based on the applicable state and federal laws and regulations, Count 4 (*id*. at 11–12); and (3) in violation of 5 C.S.R. § 20-500.190(10) and (12), the Commissioner failed to provide written final findings of fact and conclusions of law based on clear and convincing evidence, after applying the applicable state and federal law, and after allowing additional, relevant information to be submitted, Count 5.   (ECF No. 1 at 12–13).

"Due process is flexible and calls for such procedural protections as the particular situation demands."  *Reaves*, 422 F.3d at 682 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).  The fundamental question is whether plaintiff had "the opportunity to be heard at a meaningful time and in a meaningful manner."  *Id.*  (quoting *Mathews*, 424 U.S. at 333).


1)      The State Agency's Decision

The State agency must provide plaintiff a written decision that expresses "the reasons for the determination, including the clear and convincing evidence that forms the basis for the determination of eligibility."  29 U.S.C. § 722(a)(5)(C)(i).  This written decision may be "supplemented as necessary by other appropriate modes of communication consistent with the informed choice of the individual."  § 722(a)(5)(C).

VR provided plaintiff a meeting where the reasons for the closure of her case were discussed with her and her advocate.  VR described the multiple problems it encountered with plaintiff while attempting to work with her:  her unwillingness or inability to

cooperate; attending only one meeting regarding the voice-activated software; never following up on job leads, with speech therapists or counselors; never attending a benefits planning meeting; being reluctant or not returning phone calls; failing to use provided facilities to make calls, do informational interviews, or practice using the voice-activated software; not exploring any vocational goals and remaining fixed on a goal that VR stated was not attainable; dropping or not enrolling in classes for speech therapy;[1] and not installing the voice-activated software on her own computer, because she did not purchase the required hardware.  (ECF No. 13 at 6.)  Then plaintiff was provided a written letter providing the reason for denial of benefits:  "[d]ue to the severity of your disabling condition, it appears that you are unable to benefit from our services at this time."  (*Id.* at 7.)

Here, plaintiff was provided a meeting to discuss the closure of her file and VR's various reasons for the closure on September 9, 2014.  (ECF No. 13 at 6.)  She was provided an opportunity to be heard before the denial letter was issued one month later.  Although the October 7, 2014 letter only stated one reason for the closure--plaintiff's "disabling condition," this was supplemented, as allowed in § 722(a)(5)(C), by the meeting on September 9, 2014.  (ECF No. 13 at 7.)  Plaintiff was given adequate due process by VR, namely the opportunity to be heard at a meaningful time and in a meaningful manner.  Therefore, judgment is proper for defendants on Count 3.

### 2) The Hearing Officer's Decision

Plaintiff alleges a violation of her due process rights under 5 C.S.R. § 20-500.190(8) by the hearing officer (Count 4), when the hearing officer failed to provide

---

[1] It appears that plaintiff has completed some speech pathology classes, but it may have been after her case was closed.  (ECF No. 20.)

clear and convincing evidence upholding VR's decision to deny plaintiff services based on the severity of her disabilities.  (ECF No. 20 at 8–10.)

Title 5 of the Missouri Code of State Regulations § 500.190(8) provides, "[t]he impartial hearing officer will make a decision, including findings of fact and conclusions of law, based upon the provisions of the approved state plan, the federal act and/or applicable regulations, and appropriate state laws and/or regulations."  5 C.S.R. § 20-500.190(8).  Both sides may submit additional evidence during the hearing and nothing in Missouri or federal statutes and regulations indicate that the hearing must be limited to the denial letter alone.  *Reaves*, 422 F.3d at 682.

Plaintiff had ample notice of the reasons for her denial.  She was present, with an advocate, at the September 9, 2014 meeting, where her intransigence, failure to cooperate, and her limitations were discussed in detail.  (ECF No. 13 at 6.)  These were the same matters discussed at the hearing and then in the hearing officer's decision.  (ECF No. 9-1 at 2–6.)  The hearing officer provided numerous examples of plaintiff's uncooperative nature, her intransigence regarding finding an appropriate employment goal, as well as plaintiff's own declared limitations.  (*Id.* at 2–6; ECF No. 13 at 360–61.)  As to her disabilities, plaintiff did provide two affidavits of doctors stating that she could work, if provided certain accommodations.  VR, however, after working with her for over three years, was persuaded by plaintiff's own actions, inaction, and statements regarding the limitations she would require—long breaks reclining with an ice pack, inability to work more than one day in a row, inability to work more than two hours at a time, and difficulty with prolonged activities without changing positions.  (ECF No. 13 at 360–61.)  As previously stated, due process requires the court to decide if plaintiff had "the opportunity to be heard at a meaningful time and in a meaningful manner."  *Reaves*, 422 F.3d at 682 (quoting *Mathews*, 424 U.S. at 333).  This court finds that plaintiff's due process rights were not violated by the hearing officer's decision, as she was heard at a

meaningful time in a meaningful manner.  Therefore, judgment is entered for defendants on Count 4.

       3)      <u>The Commissioner's Decision</u>

Plaintiff alleges that her due process rights under 5 C.S.R. § 20-500.190(10)-(12) were violated by the Commissioner when she failed to provide parties with an opportunity to submit additional evidence, upheld the hearing officer's decision, and failed to provide written findings of fact and conclusions of law (Count 5).  (ECF No. 20 at 10-11.)  The court agrees with plaintiff.

Title 5 of the Missouri Code of Regulations § 20-500.190(10) - (12) states,

(10) The commissioner or designee shall provide an opportunity for submission of additional information relevant to a final decision.  The commissioner may not delegate the responsibility for reviewing the written decision of the impartial hearing officer to any VR staff.

(11)  The commissioner or designee shall not overturn or modify the impartial hearing officer's decision or part of the decision supporting the position of the applicant or eligible individual, unless the reviewing official determines, based upon clear and convincing evidence, that the decision of the impartial hearing officer is clearly erroneous on the basis of being contrary to the approved state plan, the federal act and/or applicable regulations, or the appropriate state law and/or regulations.

(12)  The commissioner or designee shall provide a written final findings of fact and conclusions of law to the applicant or eligible individual or, if appropriate, the applicant's representative and VR within thirty (30) days of the request for administrative review.

5 C.S.R. § 20-500.190(10) - (12).  These Missouri state regulations reflect the procedures required by the relevant federal statute, 29 U.S.C. § 722(c)(5)(D)-(F), which provides that the reviewing official described in subparagraph (D) shall—

(i) in conducting the review, provide an opportunity for the submission of additional evidence and information relevant to a final decision concerning the matter under review;

(ii) not overturn or modify the decision of the hearing officer, or part of the decision, that supports the position of the applicant or eligible individual unless the reviewing official concludes, based on clear and convincing evidence, that the decision of the impartial hearing officer is clearly erroneous on the basis of being contrary to the approved State plan, this chapter (including regulations implementing this chapter) or any State regulation or policy that is consistent with the Federal requirements specified in this subchapter;

(iii) make a final decision with respect to the matter in a timely manner and provide such decision in writing to the applicant or eligible individual, or, as appropriate, the applicant's representative or individual's representative, and to the designated State unit, including a full report of the findings and the grounds for such decision; and

(iv) not delegate the responsibility for making the final decision to any officer or employee of the designated State unit.

29 U.S.C. § 722(c)(5)(F).

As stated, in plaintiff's case the reviewing official was the Commissioner of Elementary and Secondary Education. The Commissioner's decision in this case is remarkably short: three paragraphs of substance.[2] Because the Commissioner did not

---

[2] The substantive portion of the Commissioner's opinion reads,

> Guidance used to assist review of administrative proceedings requires clear and convincing evidence to overturn or modify.

> Black's Law Dictionary defines clear and convincing evidence as "Evidence which is positive, precise and explicit, as opposed to ambiguous, equivocal, or contradictory proof, and which tends to directly to establish eh point to which it is adduced, instead leaving it a matter of conjecture or presumption, and is sufficient to make out a prima facie case."

> In reviewing the documents presented at the due process hearing, the due process hearing transcript, letters from both attorneys and review of the relevant

reverse a hearing officer's decision granting relief to plaintiff, the first two paragraphs of the decision are irrelevant. This is because the standard of clear and convincing evidence is relevant only to a decision reversing a hearing officer's decision in favor of an applicant.

The remaining (third) substantive paragraph in the Commissioner's decision in effect does no more than summarily deny plaintiff's appeal. The decision provides no findings of fact or conclusions of law as required by Missouri regulations. *See* 5 C.S.R. § 20-500.190(12). The Commissioner's decision frustrates this court's preponderance of the evidence analysis, because it provides no factual basis for the ultimate conclusion, much less the "full report of the findings and the grounds for such decision," required by the Rehabilitation Act. (ECF No. 9-2.); 29 U.S.C. § 722(C)(5(F)(iii).

Further, defendants do not dispute that plaintiff was not afforded an opportunity to submit additional evidence as required by both federal law and Missouri regulations. (ECF No. 22 at 13.) Rather, defendants put the onus on plaintiff for submitting additional evidence. (*Id.*) This is not the intent of either the federal Rehabilitation Act or the Missouri regulations. Both state the commissioner or reviewer shall "provide an opportunity for submission of additional evidence;" neither requires the eligible individual to request this opportunity. *Compare* 29 U.S.C. § 722(c)(5)(F)(i) *with* § 722(c)(5)(E) (one subparagraph states the reviewing official shall "provide an opportunity" for submission of additional evidence versus "either party may request the review"); 5 C.S.R. § 20-500.190(10) *with* § 20-500.190(9) (same).

The Commissioner of Education failed to follow either federal law or Missouri regulations when performing her duties in reviewing the hearing officer's decision.

---

regulations, I find that the impartial hearing officer's decision was based upon competent and relevant evidence. Therefore, your appeal must be denied.

(ECF No. 9-2.)

Therefore, this court grants judgment for plaintiff on Count 5, and orders the Missouri Commissioner of Elementary and Secondary Education to conduct further proceedings in plaintiff's case, including an opportunity for plaintiff to submit additional evidence, and the rendering of findings of fact and conclusions of law in a final decision in meaningful review of the hearing officer's decision.

### C. Reasonable Accommodation under the Americans with Disabilities Act and Rehabilitation Act(Count 6 and 7)

Plaintiff alleges VR violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.*, by failing to provide reasonable accommodations to plaintiff; failing to employ plaintiff in order to avoid providing reasonable accommodations; and failing to refute the presumption that plaintiff's requested accommodations were reasonable (Count 6). (ECF No. 20 at 11-12.) Defendants argue that VR is not a covered entity and, thus, is not subject to the ADA. (ECF No. 22 at 14–15.) Alternatively, defendants argue that, if VR is a covered entity, it did not discriminate against plaintiff based on her disabilities, because her disabilities were not the sole reason for denial of services. (ECF No. 22 at 16–17.) Plaintiff also alleges that all defendants violated 29 U.S.C. § 794(a) by excluding her from federally funded benefits by discriminating against her solely based on her disabilities (Count 7). (ECF No. 20 at 12-13.) Defendants argue that plaintiff's disabilities were just one of many factors that resulted in the denial of benefits. (ECF No. 21 at 16.)

#### 1) Qualifying Agency under either Statute

The ADA states, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

42 U.S.C. § 12112(a). A covered entity is defined as, "an employer, employment agency, labor organization, or joint labor-management committee." § 12111(2). The federal statute does not define "employment agency." § 12111. This court need not decide whether the Missouri Department of Elementary and Secondary Education is an entity covered by the ADA, because this question is mooted by the court's determination below that even if this state agency is a covered entity, it did not violate either the Rehabilitation Act or the Americans with Disabilities Act.

### 2) Reasonable Accommodation

The ADA and the Rehabilitation Act provide protections for a disabled person who is denied employment opportunities on the basis of her disability. These protections include the consideration of reasonable accommodations. If reasonable accommodations are refused, the employer must provide justification that such accommodations would be an undue hardship; a claimant may be entitled to relief if employment is refused to avoid providing reasonable accommodations to the employee. 42 U.S.C. § 12112(b)(5)(A)–(B). When a disabled employee requests an accommodation, both employer and employee must "engage in an interactive process" aimed at employing the applicant with reasonable accommodation.

> A disabled employee must demonstrate the following factors to show that an employer failed to participate in the interactive process: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009) (quoting *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999)); *see also Ward v. McDonald*, 762 F.3d 24, 33 (D.C. 2014); EEOC v. Sears, Roebuck & Co., 417 F.3d 789,

805 (7th Cir. 2005); *Hill v. Walker*, 918 F. Supp. 2d 819, 831 (E.D. Ark. 2013) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319–20 (3d Cir. 1999)).

The burden initially rests with the plaintiff to make a facial showing that reasonable accommodation is possible. *Mason v. Frank*, 32 F.3d 315, 318 (8th Cir. 1994). If the plaintiff makes a sufficient showing, the burden shifts to the employer prove that a reasonable accommodation is not possible. *Mason*, 32 F.3d at 318 (quoting *Gardner v. Morris*, 752 F.2d 1271, 1279-80 (8th Cir. 1985)). If the employer is successful, the burden shifts back to the plaintiff to produce evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. *Id.* (citing *Gardner*, 752 F.2d at 1279-80).

In this case, plaintiff provided VR and MERS-Goodwill personnel information about the type of accommodations she and her doctor believed she would need to be gainfully employed again. These accommodations were voice activated software, digital text books, and a headset that would not put pressure on her head. (ECF No. 12 at 6–7). Plaintiff's also needed significant breaks in physical activity, the ability to recline, and the ability to ice her back at indeterminate intervals throughout the day. (*Compare* ECF No. 12 at 6–7 *with* ECF No. 13 at 360–61.)

Defendants considered her requested accommodations, but reasonably believed she should use her existing skill set, which included her undergraduate and graduate college degrees and her years of prior work experience. (ECF No. 13 at 363, 367.) VR determined it was not practical or cost effective to fund a third and fourth degree (first a Bachelor's then a Master's in Speech Language Pathology) for plaintiff. (ECF No. 13 at 363, 367.) Plaintiff repeatedly refused to consider other employment options due to her disabilities. (ECF No. 13 at 164–86, 290–91, 346–47.)

Defendants were not required to support plaintiff's personally chosen employment goal, without consideration of its reasonableness.[3]   *See Wasser v. N.Y. Office of Vocational and Edu. Servs. For Individuals with Disabilities*, 373 F. App'x 120, 120–21 (2d Cir. 2010) (consideration of costs permitted when determining the vocational rehabilitation services to provide); *Carrigan v. N.Y. Edu. Dep't*, 485 F. Supp. 2d 131, 142 (N.D.N.Y. 2007) (denying transportation reimbursement as it was not cost effective, regardless of plaintiff's alleged need); *c.f. Reaves*, 422 F.3d at 681–82 (denying acquisition of certain equipment based on VR's finding plaintiff was not suitable to that profession).   Congress used qualifying words such as "meaningful," "gainful employment", and "reasonable accommodations" in order to signal it did not intend to provide unlimited resources under the Rehabilitation Act.   *Carrigan*, 485 F. Supp. 2d at 139.   *Cf.*   34 C.F.R. § 361.50 (regulation provides agency may establish a fee schedule to ensure a reasonable cost to the program as long as it looks at the individual's needs and is not absolute denial)..

VR and Goodwill made a good faith effort to provide plaintiff with services that were both cost-effective and would meet her desire to find gainful employment, *c.f. Peyton*, 561 F.3d at 902, but those efforts were rebuffed by plaintiff, because they did not meet her self-selected goal—to be a Speech Language Pathologist.   (ECF No. 13 at 164-86, 290-91, 346-47.)   In the interactive process between VR and plaintiff, plaintiff failed to make a good faith effort to develop an employment goal with reasonable accommodations.   When her self-selected employment goal was not attainable with the accommodations she had both requested and demonstrated, she refused to discuss alternatives in good faith.

---

[3] As previously discussed, *supra* p. 25–26, an IEP must take many factors into account and be agreed upon by both the client and VR Services.   *See* 42 U.S.C. § 722(b)(4)(A), (C).

Therefore, there was no violation of the ADA or the Rehabilitation Act. Judgment for defendants is granted on Counts 6 and 7.

## CONCLUSION

For the reasons stated above, plaintiff's motion for judgment as a matter of law is granted as to Count 5. On all other claims, defendants' motion for judgment is granted. An appropriate Judgement Order is issued herewith.


_____/s/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 12, 2017.